**In the Matter of NEW YORK, ONTARIO AND WESTERN RAILWAY COMPANY, Debtor.**

United States District Court
S. D. New York.
Nov. 7, 1958.

White & Case, New York City, for Bankers Trust Co. Trustees of the Refunding Mortgage. Jesse E. Waid, New York City, of counsel.

Nathaniel M. Sokolski, New York City, for Bondholders.

Francis R. Curry, New York City, for Operating Employees.

Satterlee, Browne & Cherbonnier, New York City, for Refunding Bondholders' Committee. John Reilly New York City, of counsel.

Irving Mariash, New York City, for Charles Bennett Maar. Robert I. Ruback, New York City, of counsel.

Arthur H. Christy, United States Atty. for the Southern District of New York, New York City, Robert L. Tofel, Asst. U. S. Atty., New York City, of counsel.

Phillip R. Miller, Tax Division, Dept. of Justice, Washington, D. C.

F. N. J. Gindorff, pro se.

Samuel Zirn, New York City, pro se.

CONGER, District Judge.

Applications for compensation for services rendered and reimbursement of expenses incurred by parties in interest and their counsel from May 20, 1937 to January 30, 1957, in connection with the Debtor's reorganization proceeding (former § 77, sub. c(12), now § 205, sub. c(12) of the Bankruptcy Act, but herein referred to as § 77, sub. c(12).

The Debtor has had a long history under the Bankruptcy Act. The petition for reorganization of the Debtor was filed in 1937 and then through the years the proceeding continued until January 30, 1957, when this court dismissed Debtor's reorganization proceeding. However, this court reserved jurisdiction to determine the amount of allowances and disbursements to be paid to the parties interested pursuant to the provisions of said § 77, sub. c(12). Various claims for allowances and disbursements were duly filed with the Interstate Commerce Commission (hereinafter referred to as the "ICC") by the interested parties and application made thereto to have the ICC

Willkie, Owen, Farr, Gallagher & Walton, New York City, for New York Trust Co. Walter H. Brown, Jr., New York City, of counsel.

fix the maximum limits of final allowances of compensation for services rendered and reimbursement of expenses incurred.

The matter came on to be heard before an examiner of the ICC. A full and complete hearing was had. His report was excepted to by some of the parties, and the ICC (Division No. 4) rendered an opinion dated May 8, 1958, setting forth the maximum limits of final allowances to be paid as reasonable compensation for services rendered to the Bankrupt estate and reimbursement for actual and reasonable expenses paid.

From the very inception of this proceeding the United States has objected to the granting of any allowances.

After the opinion of Division No. 4 of the ICC was entered the Government moved for a reconsideration by the entire ICC of the report and order of Division No. 4 and for a reversal of the grant of the allowances and disbursements by Division No. 4.

On August 1, 1958 the Interstate Commerce Commission denied the petition of the Government. So the matter is now before me for final determination.

At the outset, I shall first consider and pass on the Government's contention that the ICC erred in making any allowances for services and disbursements.

The amounts allowed for services and disbursements totaled $112,083.31. There is in the estate now in the neighborhood of $8,500,000.

The Government's main contention is that there can be no allowances paid out of the Debtor's estate for expenses and services "in connection with the proceeding and plan" to parties in interest for voluntary expenditures and services when no plan of reorganization has been consummated; that no allowances should be granted where the Railroad has been held incapable of reorganization and the proceedings dismissed, and where because of futile proceedings and operations at a loss, the property of the Debtor has been so depleted that after liquidation the proceeds are insufficient to pay the liabilities of the Trustee arising out of said operations; that no allowances should be made to attorneys where the services have not only failed to contribute substantial benefit to the equitable owners of the proceeds of liquidation of the estate but have been largely to their detriment.

There were several other objections by the Government to the report which I do not regard as having any weight or they are merged in the general objection that the ICC has erred in ignoring judicial decisions and the ICC's own prior decisions in regard to the construction and application of the language of § 77, sub. c(12).

The primary and fundamental question here is: No plan of reorganization of the Debtor was ever effected, although several attempts were made. The ICC found that no plan of reorganization could be effected for the Debtor. Under those circumstances may allowances be granted to the parties and attorneys who, as they claim, performed services beneficial to the estate. We are all agreed that this question has never been judicially passed on.

Division 4, in its opinion, very succinctly disposes of this question:

"* * * While we agree with protestant that the 'contributive value test' is generally applicable to the determination of allowances under this subsection, we do not agree that the failure to effect a plan of reorganization is *prima-facie* evidence that parties to the proceedings have failed to contribute anything of benefit to a debtor's estate. The cases cited by protestant in support of its contention relate principally to the construction of the word 'benefit'. No case was cited which supports the proposition that under section 77(c) (12) no benefit can accrue to the estate unless the proceedings in reorganization have resulted in a consummated plan.

"There is no basis in the language of section 77(c) (12), in its natural

meaning, or in equity, for constru-ing it as providing that successful consummation of a plan is a condi-tion precedent to the grant of any allowance in the reorganization pro-ceeding. In fact the language itself is inconsistent with that result. Subsection (c) commences with the phrase 'After approving the peti-tion', and employs the phrase 'in con-nection with the proceedings and plan.' There is nothing in this lan-guage to indicate that approval and consummation of a plan are a pre-requisite to the making of allow-ances under this subsection. And section 77(i) provides, among other things, that, upon the dismissal of a reorganization proceeding under this section, 'the judge may include in the order of dismissal appropriate provisions directing the trustee * * * to transfer possession of the debtor's property * * * upon such terms as the court in the pro-ceeding under this section may deem equitable * * * for the payment of administrative expenses and *al-lowances* in the proceedings hereun-der.' Obviously, conditions for the payment of allowances could not be imposed in these circumstances if consummation of a plan of reorgan-ization were a condition prerequisite thereto." (pp. 4–5) (emphasis sup-plied by ICC)

▉▉ I agree with the language of the opinion above set forth. As I wrote before, this is a new situation, under the Bankruptcy Act here pertinent. The Government does cite cases which it claims generally sustain its position. Those cases relate to another bankruptcy section not here pertinent. However, I go along with the ICC. There is nothing in § 77, sub. c(12) which gives support to the contention that consummation of a plan is a condition precedent to the granting of an allowance in this re-organization proceeding. There is noth-ing in the language of the subsection to indicate that there must be a success-ful plan before I may grant proper al-lowances. As the report of the ICC states, the Government's contention is not based on the words of the statute but on the premise that allowances under the subsection can be made only for services and expenses that have been of benefit to the estate and no such benefit could result in the absence of an effected plan of re-organization.

The ICC rejected that theory. I agree with it.

The cases cited by the Government deal principally with the construction of the word "benefit". I agree with the finding of the ICC in that respect. See quotation, supra.

A brief look at the picture of this pro-ceeding for 20 years might help out. Over 1,100 motions were made; 1,100 orders were signed; and appeals from three such orders were taken. I came into this proceeding in the Fall of 1947.

As I look at it now, it seems to me that there were motions before me at least every two weeks. These parties or their attorneys were present at practically every proceeding before me. The par-ticipation of the attorneys for the Bank-ers Trust Company and New York Trust Company started from the inception of the proceeding. These motions before me had to do with the running of the Railroad and covered many topics: sale of special property, sale of the entire property, leases of various properties, contracts with the employees (this last prolonged and numerous), settlement of a strike, and many other and varied items too numerous to mention. These at-torneys appeared on practically all of those motions and participated actively. They were representing trustees under mortgage bonds and bondholders, all with a direct interest in the future of the Railroad, and as I look back at it now, they acted as prudent and experienced men of affairs would have acted in sim-ilar predicaments.

Who can say that they did not benefit the Railroad? These various predica-ments had to be solved to keep the Rail-road going, with the hope that eventually

a successful reorganization might be consummated.

The Government advances several other reasons for refusal to make allowances here. I shall not refer to them because I regard them as not having any merit. I have passed on the main contention of the Government and find against it. I follow the opinion of Division No. 4 of the ICC.

### Re Amount of Allowances.

The ICC has gone into this question with a great deal of care. This is evidenced by the opinion of Division No. 4. I have read this opinion thoroughly, also the petitions and briefs filed by the various parties. The ICC gave all of the interested parties opportunity to present evidence either in support of claims or in opposition. I have read this testimony.

I feel that the ICC, in coming to its decision, did so after careful deliberation buttressed by its long experience in railroad matters and railroad financial difficulties. I feel that while the findings are not binding on me, I should accord great weight to the opinion of this highly specialized agency of the Government.

In passing on the amounts to be awarded, I shall confine myself at the outset to the claims of White & Case; Willkie Owen Farr Gallagher & Walton; Mahlon Dickerson and Nathaniel M. Sokolski. Their principals, to whom I have already referred, are making no claims here. Their attorneys are making the claims for services rendered and for disbursements necessarily incurred.

There can be no doubt that these attorneys rendered services and spent many hours on the problems that arose in the course of this proceeding. It would be a waste of time and energy for me to detail separately the services rendered by each of these attorneys. I shall treat them generally as a group.

During my tenure as the judge in charge of this proceeding, these attorneys appeared before me many times. They were experienced lawyers, several of them well experienced in this type

of legal jurisprudence. I found them at all times extremely interested, active and industrious. At times there were highly controversial matters. I cannot say that they always agreed with me, with the Trustee, or with his attorney. On various occasions a great deal of testimony was taken. My recollection is that from the time these attorneys entered this proceeding they rarely missed a motion before me and usually took part in it either by argument or the examination of witnesses.

When one considers that there were 1,100 motions made by the Debtor's Trustee and 55 made by other parties, and that there were 1,100 orders entered and three appeals, one can see that there was opportunity for these attorneys to work if they would, and my observation is that they did care to and did perform voluminous services. Many of these motions were most important and required much study.

The Cumulative Topical Index (May 20, 1937 to June 14, 1954) (Ex. A) attached to the affidavit of Jesse E. Waid (May 8, 1957) gives an idea of the number and variety of subjects handled. Before I came into the picture there was the question of getting rid of the steam locomotives and substituting Diesel engines. It was thought that this might be a great aid to the successful running of the Railroad. From my reading I gather that three of the attorneys here put much time and effort into that project. During my regime, it seems to me that every week or two there were motions before me. Many concerned items that had to do with the actual running of the Railroad. There were many others more important. We did have constant worry about the labor situation. There was actually one strike, which tied up the Railroad for several weeks. During most of the time there was pending an application for increased wages. And there were threats of another strike. I spent many hours in court and out of court with these lawyers and others in an endeavor to solve these labor difficulties.

I can now say that the employees were most justified in seeking a higher rate of pay. I believe I wrote this on several occasions, but stated there was no money to pay them. I know these attorneys spent considerable time and effort on this labor question.

Then very often there were propositions to sell separate parts of the Railroad, to sell equipment and rails. On many of these sharp issues were raised. Mr. Cohen (Mr. Sokolski's principal) entered into these. He frequently was able to obtain higher bids and often himself bid substantially higher.

Then, of course, there was the Trustee's effort to sell the entire property. All of these attorneys participated most actively in opposing this plan. I believe that there were two attempts made by the Trustee to so sell. A great deal of testimony was taken with a number of court hearings. I eventually decided that I had no jurisdiction to sell.

Finally in this connection was the Trustee's plan of reorganization which was heard by the ICC. All of these attorneys participated in successfully opposing the plan.

There was also the question of increasing the business of the Railroad. The trouble with the Railroad was that it lacked business. This, of course, was a matter primarily for the Trustee, but I personally put a lot of time and effort into it. I called several meetings at the Courthouse of citizens along the Railroad route, shippers, town and village authorities, and others (including, I believe, the attorneys here). We discussed various plans which might resurrect the Railroad.

Mr. Sokolski and Mr. Cohen from time to time did their bit with the hope of bringing more business to the Railroad. When Mr. Alsop was in the proceeding, he put in a real effort to keep the Railroad going, with the hope of getting it strong enough financially so that there might be a successful reorganization. On one occasion he had a plan with the Bethlehem Steel Company to bring ore down from Canada. This was not a dream. I felt that if this came through the troubles of the Railroad would be over. It looked promising for a time, then the Bethlehem Steel Company adopted other means of bringing its ore to the United States.

Then of course there was the plan for the New York, New Haven and Hartford Railroad to take over. There is no necessity for me to go into the details of this plan now. It meant that the New York, New Haven and Hartford Railroad would take over the Debtor's Railroad. It looked promising. I know that the president of that Railroad was interested. I granted him several adjournments before he finally told me that the New Haven had decided not to go along. Mr. Alsop was most active and energetic. He had other plans to increase the Railroad's business.

There was the attempt in the Court of Appeals to establish the priority of the mortgage liens over the New York State Grade Crossing Elimination claims. True, in this case the mortgage interests lost and the State prevailed, but it seems to me that does not prevent the mortgage interests from claiming that the estate was not benefited. At least they caused this important question to be settled.

A great deal of time was spent toward the end on the matter of classification of claims. The court, after considerable argument, finally granted the application for classification. These attorneys appealed. As I understand it, the appeal was never decided. It actually was a moot question after this court granted the motion to dismiss the reorganization proceeding.

At this time it might be well to answer the Government's contention that there was much duplication of effort here. True, many of the problems were matters for the Trustee, but these parties and attorneys often disagreed with him. Again, these attorneys largely represented different interests. Certainly, in all good judgment, one could not expect the attorneys for one Trust Compa-

ny to turn over its problems to the attorneys for another Trust Company. I kept the number of intervenors down. It does not seem to me that there was any material duplication here.

The Government also contends that the Trust Companies should pay their own attorneys here or that they should be compensated by the bondholders. The attorneys contend that there is no provision in the mortgages for any such payment. I agree with them.

The Government also contends that the attorneys here made several applications to abandon this proceeding, well knowing that no successful reorganization could be had. The general answer is that there was a disagreement by the articulate bondholders; that they all had the hope that eventually the Railroad might prosper and that abandonment would end it all for every one. I agree. I also had hopes.

Now I will take up the specific allowances to each of the above parties and their attorneys who actually are making claims.

Bankers Trust Company, Trustee under the Refunding Mortgage, and attorneys, White & Case, Counsel.

■ For this firm of attorneys, Jesse E. Waid, an attorney experienced in this type of legal litigation, makes the petition and affidavit. He appeared before me on most of the court proceedings. This firm was in this proceeding from its very beginning. In addition to the general statement of services heretofore set forth, this firm participated in three appeals to the Court of Appeals. During the course of the proceeding they did, on three occasions, move to abandon the proceeding, but did not prosecute their petitions to final determination because, as they state in their petition herein, they deferred to the articulate holders of Refunding Mortgage Bonds, who expressed the view that their best hope was based on the continued operation and the possibility of ultimate reorganization of the Debtor.

This firm kept a daily record of the services performed and it shows that the total amount of time devoted to the Mortgage Trustee in this proceeding was 7,413 hours, of which 2,612 hours was partners' time and the remaining time, 5,251 hours, involved services rendered by associates of the law staff; that 360 hearings were attended and 2,000 letters written and received.

An interesting exhibit (Ex. B) is attached to the supplementary affidavit of White & Case, dated May 8, 1957. This is a list of pleadings, etc., filed by Bankers Trust Company in this proceeding. The list takes up practically six typewritten pages. It should be noted that part of this firm's services were rendered before the ICC, but for the most part before this court.

Within a short time after the report and order of the ICC was certified to the District Court, the Mortgage Trustee by its attorney moved for a dismissal of the proceeding in accordance with the recommendations of the ICC. Later, four petitioners joined with the Government and others in filing an amended petition for dismissal, which was granted on January 31, 1957.

White & Case have asked for an allowance of $60,000 and disbursements of $2,-627.94. The ICC has fixed the sum of $48,000 plus expenses of $2,627.94 as the maximum limits of compensation and expenses.

New York Trust Company, Trustee under General Mortgage, and Willkie, Owen, Farr, Gallagher & Walton, Counsel.

■ The petition and affidavit on this application were sworn to by one of the partners of this law firm, Walter H. Brown, Jr., an attorney experienced in matters of this type. This firm was in this proceeding from its very inception and through the years down to the end, to January 30, 1957. This firm participated in plan hearings before two examiners of the ICC, in 1940 and in 1946, its participation being active. The great-

er part of its services was rendered before this court.

The records of this firm show a total of 2,314¾ hours devoted to services herein, as follows:

1,377¾ hours by Mr. Brown
   79    "    by other partners
  858    "    by associates,

and expenses of $110.95, of which $23.04 was advanced by the Mortgage Trustee.

In his affidavit, Mr. Brown states that an examination of the records of his office show that there were approximately 450 to 500 hearings in this court and conferences in chambers; that not less than approximately 300 of such hearings and conferences were attended by a partner or senior associate of his firm and that each required one hour of lawyer time and some a full day.

Their application is for $25,000 allowance and expenses of $110.95. The ICC has fixed $20,000 as the maximum limit of allowances with $87.91 expenses to the law firm, and $23.04 to the Mortgage Trustee.

The Refunding Bondholders' Committee:
Hunt Hill & Betts
and
Mahlon Dickerson, Counsel
F. N. J. Gindorff, Expert.

■ This claim is a bit involved. It started back in May 1947 when a group of Refunding Bondholders was formed with Reese D. Alsop, of the firm of Hunt Hill & Betts, as its counsel. Later a committee was formed. The committee has changed from time to time and various orders of intervention were made. However, I refer to the report of Division No. 4 of the ICC for a full and particular statement thereof. Then Mr. Alsop passed away on August 1, 1954 and Mahlon Dickerson of the firm of Satterlee Browne & Cherbonnier was substituted as counsel for this committee.

This application is for an allowance to Mahlon Dickerson and the firm of Satterlee Browne & Cherbonnier, and the firm of Hunt Hill & Betts for services and for reimbursement of expenses. I have heretofore referred generally to the services rendered the estate by these attorneys and to the particular services rendered by Mr. Alsop. I did omit to mention that Mr. Alsop spent a great deal of time in attempting to assist the court in selecting an experienced railroad man as Trustee, at a time when there was a vacancy. Most of Mr. Alsop's and Mr. Dickerson's time was spent before this court, although Mr. Dickerson or his partner did attend before an examiner for the ICC in the Spring of 1955 on the reorganization hearings. Petitioners claim that from May 1947 to August 1954, Mr. Alsop was engaged 729 times in the affairs of the Debtor for a total of 2,017 hours, which included 84 court proceedings, numerous conferences with the group and the Committee; that on many occasions he went to Washington, Wilmington, Pittsburgh and Philadelphia in his effort to aid this railroad; that for a period prior to January 1, 1955 to January 15, 1957, Mr. Dickerson had devoted 76½ hours prior to the death of Mr. Alsop and 235 hours thereafter, with 43 court appearances. It also appeared that junior associates of Hunt Hill & Betts performed 26 hours of services to the Committee and associates of Satterlee Brown & Cherbonnier also rendered services to this Committee but their time spent was not detailed in the record.

Petitioners asked for an allowance of $75,000 and disbursements in the sum of $2,256.36. The ICC granted as a maximum limit $15,500 in compensation and expenses of $1,919.42 payable as follows: $8,500 allowance and $1,146 for expenses shall first be paid to the firm of Hunt Hill & Betts and the remainder, if any, shall go to Mr. Dickerson and his present firm.

Refunding Mortgage Bondholders' Group
Mr. Cohen
and
Nathaniel M. Sokolski, Counsel.

■ Mr. Sokolski represented in this proceeding Henry I. Cohen, a bondholder,

and a group of bondholders who were owners of $2,021,000 of Refunding Bonds.

Mr. Cohen came into this proceeding with Mr. Sokolski as attorney on October 22, 1952. At the time I wrote in the order that Mr. Sokolski probably would receive no compensation from the estate. I thought at the time that Mr. Cohen was interested only temporarily and might soon lose interest, but as time went on Mr. Sokolski was about the most active attorney in all the proceedings before me, so I amended the order subsequently and permitted him to apply for compensation.

I have already referred to the activities of Mr. Cohen and Mr. Sokolski but I should note that Mr. Sokolski appeared before the ICC and presented a plan of reorganization proposed by the Bondholder group, and also opposed the plan proposed by the Trustee. The hearings took place in March, May and June, 1955.

Mr. Sokolski took a very active part in this proceeding and prepared papers, briefs, and conducted examination and cross-examination of witnesses. He states that he has been served with approximately 700 legal papers, and in many cases prepared answering affidavits, answers and cross petitions; that he appeared in many proceedings before this court and that he has examined and cross-examined witnesses and parties in proceedings in this court; that he attended 80 hearings in this court; that he participated in two appeals; that he made three trips to Washington, D. C. and five trips to Middletown, N. Y. in connection with matters in this proceeding; that he spent approximately 1,262 hours on matters pertaining to this proceeding. The ICC fixed the limit of Mr. Sokolski's compensation at $15,000.

In addition to the above, I know that due to the great volume of business connected with this proceeding, these attorneys mentioned above had a great many petitions, affidavits, orders and other papers to serve, to answer and to examine the law. There was a great deal of detail attached to this proceeding,

certainly since I came into it. They all refer, in their affidavits, to frequent consultations with their clients and with other persons interested in the proceeding. There were many briefs to prepare. This court can well see the great amount of labor put into this effort by these attorneys. True, they were guided by the thought of aiding their client, but such aid involved and did aid the railroad, with the final hope that a successful reorganization might be had. I believe the services set forth by these attorneys were necessary and have been of benefit to the estate.

The sums awarded by the ICC here as a maximum limit by way of compensation and reimbursement of expenses are well within the limit which in all equity these petitioners should receive, and I fix for these attorneys the sums by way of compensation and reimbursement of expenses which the ICC has allowed.

Mr. F. N. J. Gindorff has submitted his affidavit for allowance and disbursements through the counsel for the Refunding Bondholders Committee.

Petitioner is a railroad analyst of long experience with qualifications as an expert witness in railroad matters.

In November 1949 the Committee employed petitioner as a consultant and adviser to the Committee. From January 1950 to the date of the termination of this proceeding, petitioner has been actively engaged in working for the Committee. At the outset petitioner made a comprehensive review and intensive study of all the aspects of Debtor's problems, financial, traffic, operational, etc. He prevailed upon the Trustee to have a segregation of earnings study of all of Debtor's lines. The report was analyzed by petitioner and submitted to the Committee.

Petitioner attended meetings of the Committee and hearings before this court and the ICC, made notes of the same and reported findings to the Committee.

Petitioner had numerous discussions with the Trustee of the Debtor, with the

ICC, with the Reconstruction Finance Corporation, the New York Public Service Commission, New York Port Authority, with the president, attorneys or other officials of at least eight major railroads serving Debtor's territory, for the purpose of finding some solution to Debtor's problems. He also conducted studies of possible aids to added traffic and earnings for the Debtor from such sources as the St. Lawrence Waterway, from movement of Labrador iron ore through the Port of Oswego, from a truck-rail "piggyback" operation between New York City and northern stations of the Debtor.

Petitioner also assisted the Committee in preparing its plan of reorganization, and studied all other plans for sale of Debtor's property and plans for reorganization submitted by others.

On five occasions petitioner was prepared to testify before the court or the ICC. He did so testify on two occasions. In preparation for his testimony petitioner was required to put in many weeks of research in order to prepare himself fully to so testify. Petitioner has stated in his affidavit that during the 74 months since January 1950 he devoted 24 months and five days to serving the Committee, the Debtor and other creditors in his capacity as consultant and advisor; that his regular fee is $1,500 a month but that due to the unusual conditions he is asking to be paid $375 per month or in all $9,000 and $500 expenses; that when he was employed by the Committee the agreement was that his compensation would come only from whatever allowance was made to him by the ICC and this court. The ICC has disallowed the request for $500 for expenses, but has fixed the sum of $3,000 as the maximum limit of petitioner's compensation. I agree with the Commission and fix the compensation of petitioner at $3,000.

### City of Middletown and other Municipalities, and William H. Fitzgerald, Counsel.

Mr. Fitzgerald makes claim for compensation and reimbursement for expenses. The amount for which Mr. Fitzgerald asks is $15,000 and covers services rendered by him between 1953 and January 1957.

Mr. Fitzgerald was permitted to intervene in this proceeding and represents 37 municipalities through which the Debtor Railroad passes. It includes nine counties and eight cities and approximately 20 villages. Mr. Fitzgerald testified before the ICC as to his request herein and stated that he originally intervened in the proceeding at the instance of the attorney for the Trustee, who suggested that it would be easier to deal with one representative than with 37 municipalities.

Mr. Fitzgerald appeared before me a number of times and also before the ICC. I believe he gave a great deal of help to the Trustee and his attorney. He supported the Trustee's application to sell the property as a whole and also supported the Trustee's application to sell the property as the result of a plan. He also states that he aided the financial officer of the Debtor in a tax situation. I know that Mr. Fitzgerald did put a great deal of time and energy into this matter.

His petition states that he spent 1,138 hours in this matter, consisting of attendance at court, at the meetings of the ICC, conferences with representatives of the Trustee, with representatives of the municipalities for whom he intervened, and other matters in connection herewith.

It would be idle for me further to detail the activities of Mr. Fitzgerald in this matter, inasmuch as the ICC in its order has fixed no maximum limit of compensation for him. I must agree with the ICC. When Mr. Fitzgerald first asked to intervene on behalf of the City of Middletown, I stated as follows:

"you will have to do it under this condition: that there will be no loss to the estate for your services. You might as well have that understood anyway."

To which Mr. Fitzgerald replied:

"That is satisfactory to me."

In all of the orders of intervention signed by me for Mr. Fitzgerald, the

court states: "Counsel for the intervenor shall not be paid any compensation from the funds of the Debtor." I think that during all of Mr. Fitzgerald's services in this proceeding he was aware of this prohibition against any compensation from the estate. Further, I believe with the ICC that he should not be compensated here because he was not representing a party. Under the provisions of § 77, sub. c(12), no compensation is allowable from the Debtor's estate for the time spent by counsel serving persons who are not parties to the proceeding.

### Refunding Mortgage Bondholders' Group John Bennett Maar:

■ Mr. Maar is the holder of General Refunding Mortgage bonds of the Debtor and chairman of a group of holders of said bonds. He first acquired bonds in 1937. He was not a railroad man but his experience was limited to accounting, banking and real estate. He claims to have rendered services to the Debtor's estate in the course of this proceeding. Among other things, he states that in 1952, through his efforts, a contract of sale of the Debtor was arranged with R. A. Nordblom for $7,000 cash and about $30,000,000 par value of securities.

Mr. Nordblom died before the transaction was consummated and Mr. Maar claims that he arranged a contract of sale on similar terms with one Lincoln Epworth which was filed on June 5, 1952. This transaction was to be part of a plan of reorganization but was not consummated eventually. Mr. Maar claims that he negotiated with Mr. Alsop and the bondholders' committee and supplied them with statistics and data leading to the reorganization plan filed by the said committee in November 1952, and that petitioner consulted with numerous parties interested in support of said plan; that in 1953 petitioner formed a bondholders' group and prepared and filed, on August 1, 1953, a reorganization plan, and petitioner performed considerable and extensive research work in connection therewith; that he prepared two amendments to the plan which were filed in January 1954 and June 1955; that the said plan as amended was presented at hearings held before the ICC on June 10, 1955 and that this plan was one of four reorganization plans presented to the ICC and one of the only three plans heard by it.

Petitioner further claims that he expended extensive and continuous efforts and research from 1952 through 1956 to protect the assets of the Debtor, having material effects in obtaining higher prices on sales by the Trustee, the resignation of the Trustee, and ultimately a dismissal of the proceeding.

Petitioner claims that he became interested in the Debtor in 1937; that from 1951 until the end of the proceeding, he took an active interest in the proceeding; consulted with various officials and parties interested in the Debtor; that he attended practically every court session and every meeting held in connection with the affairs of the Debtor. I do know myself that during the time that I had charge of this matter, Mr. Maar was present at nearly every hearing held before me and on various occasions was interested in the propositions presented to me.

Petitioner is not claiming any compensation; he is simply asking to be reimbursed for expenses which were incurred by him during the course of his work. Petitioner has asked for the sum of $8,425. The ICC has disallowed $950 which petitioner claims he paid to Sage, Gray, Todd & Simms, Attorneys, for their services, but the ICC has allowed him $100. Petitioner also claims he made 12 trips to Washington to consult with members of the ICC during the course of this proceeding. He claims $600 expenses. The ICC has allowed him one-half or $300, for this. He also claims $200 for four trips to Washington to consult with Senators Lehman and Ives and Representative St. George and other members of Congress. This the Commission has disallowed. He also

claims $1,500 for traffic service and research, in Montreal, Toronto, Hamilton, Detroit, Ludington, Hamilton, Chicago and other cities—10 trips. This the ICC disallowed, stating in its opinion:

"While no doubt his services in these respects were rendered in an effort to produce sufficient revenues to warrant making a plan of reorganization, the operation of the railroad and solicitation of traffic were matters for which the trustee was responsible. Maar's work in such respect was voluntarily undertaken. There is no showing of benefit to the Debtor's estate from these activities. Accordingly the expenses connected therewith are not allowed."

He also claims $1,500 for traffic research and investigation of realty and other transactions to Oswego, Oneida, Rome, Utica, Hamilton, Norwich, and other points on the line, and to various county seats, Goshen, and sundry trips. While the ICC in its opinion does not mention this item, in coming to its final conclusion, as I see it, it must have granted this. Testimony was taken before the ICC in connection with this item. Mr. Maar testified that he made 100 trips or more along the road in connection with the effort to sell property. He particularized a number of such incidents. He testified that his expenses were over $2,500 on that item, which he could fully support by checks. He testified that on many occasions he had people with him, members of his group, such as Mr. Cohen or Mr. Sokolski, or other members.

As I see it, the ICC has made him the following allowances for reimbursement of expenses:

| | |
|---|---|
| Legal expenses: | |
|   N. M. Sokolski | $1,225.00 |
|   Sage, Gray, Todd & Simms | 100.00 |
| Printing expenses | 2,150.00 |
| Typing and clerical expense | 300.00 |
| Trips to Washington to consult officials of the ICC | 300.00 |
| For traffic research, investigation of realty and other transactions, to Oswego, Oneida, Rome, Utica, Hamilton, Norwich and other points on the line, and to various county seats, such as Goshen, and sundry trips | 1,500.00 |

Here we are dealing solely with reimbursement for moneys spent. I go along with the ICC and award to the petitioner the amounts hereinabove set forth, to wit, the total sum of $5,575, as reimbursement for moneys expended by him during the course of his activities in this proceeding.

### Samuel Zirn.

Mr. Zirn has made application here for $3,000 for his services as attorney and for reimbursement of expenses amounting to $350. In his petition and affidavit herein and in his testimony before the ICC, he has set forth the legal services which he rendered the estate, which he claims were necessarily rendered, and the expenses incurred in this proceeding while representing himself as a party in interest. He says that such services were rendered and expenditures made solely in the interest and for the benefit of the reorganization estate or its bondholders as a class, and not for any special benefit that might

possibly accrue to any individual as a bondholder or otherwise.

Mr. Zirn is the owner of about 110 of the Refunding Mortgage bonds ($1,000 par), which he acquired between 1937 and 1947.

Mr. Zirn's contention is that between June 15, 1947 and January 1957 he devoted the equivalent of about 60 normal lawyer's days or at least 420 hours of active service in connection with his services above mentioned.

The said petitioner contends that he had had a long and special knowledge of the law and practice of railroad reorganizations; that the services so rendered to the estate were rendered between June 1950 and January 1957. In his petition he sets forth at length the services which he claims he rendered. He also testified to the same effect before the ICC in connection with the application for this allowance. It will not be necessary for me to specify at length these services claimed by Mr. Zirn inasmuch as the ICC placed no maximum limit of compensation for the services of Mr. Zirn. I therefore shall deal only with the finding of the ICC that Mr. Zirn is entitled to no compensation for services rendered.

The ICC found that because Mr. Zirn was a bondholder he was entitled to be reimbursed only for actual expenditures and they did give him an award of $350. But they rejected his claim for compensation as attorney. Mr. Zirn's contention is that the ICC had no authority to so find; that they should at least have fixed a maximum and left it to the court to determine whether or not he was entitled to any portion of it; that the ICC lacked the power to make any rulings of law and could only suggest or urge legal contentions, and it is for the courts, which alone provide the judicial power, to make such final rulings of law.

Whether or not Mr. Zirn is correct in this, however, I feel that the ICC was right in its conclusion. Mr. Zirn, as a bondholder, was a party in interest, and as such party in interest (§ 77, sub. c(12), he would be entitled to be paid out of the Debtor's estate only "for the actual and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceedings and plan by parties in interest." Mr. Zirn contends that the finding of the ICC is based upon "[a] clearly untenable technical ground".

I agree with the ICC in its finding as follows:

"We find no merit in applicant's contentions. The record shows that he is a bondholder of the debtor and as such 'a party in interest' to the proceedings. Section 77(c) (12) provides that within such maximum limits as are fixed by us, 'the judge may make an allowance, to be paid out of the debtor's estate, for actual and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceedings and plan by parties in interest and by reorganization managers and committees or other representatives of creditors and stockholders, and within such limits may make an allowance to be paid out of the debtor's estate for the actual and reasonable expenses incurred in connection with the proceedings and plan and reasonable compensation for services in connection therewith by trustees under indentures, depositaries and such assistants as the Commission with the approval of the judge may especially employ.' The provision in respect to 'parties in interest' covers only reimbursement of *actual* and reasonable expenses incurred in connection with the proceedings and plan. This may include reimbursement for a reasonable attorney's fee if one is actually incurred, but it does not include compensation for one's own services as an attorney. The only services for which compensation may be awarded under sec-

tion 77(c) (12) are those performed by trustees under indentures, depositaries, and assistants employed by us with the approval of the judge. Obviously, applicant's services do not fall in the latter categories. In the circumstances we are without authority to fix a maximum limit of compensation for his services." (pp. 10–11)

From the above it will appear that I have followed the recommendations of the ICC. I have done so because I believe that the maximum limits of compensation and reimbursement of expenses are well within the amounts earned. I also agree with the ICC in its refusal to make certain allowances. Therefore, I direct that the following allowances and expenses be paid out of the funds of the Debtor which are now in the possession of the Equity Receivers appointed herein by Judge Ryan, and that the amounts of compensation and reimbursement for expenses be as follows:

|  | Compensation | Expenses | Total |
|---|---|---|---|
| Bankers Trust Company, Trustee under Refunding Mortgage |  | $2,627.94 | $ 2,627.94 |
| White & Case, Counsel | $48,000.00 |  | $48,000.00 |
| New York Trust Company, trustee under general mortgage |  | 23.04 | 23.04 |
| Willkie, Owen, Farr, Gallagher & Walton, counsel | 20,000.00 | 87.91 | 20,087.91 |
| Samuel Zirn |  | 350.00 | 350.00 |
| William H. Fitzgerald | — | — | — |
| Refunding Mortgage Bondholders' Committee | — | — | — |
| Hunt Hill & Betts, counsel ⎱ Mahlon Dickerson, counsel ⎰ | 15,500.00 | 1,919.42 | 17,419.42 |
| F. N. J. Gindorff, expert | 3,000.00 | — | 3,000.00 |
| Refunding Mortgage Bondholders' Group Nathaniel M. Sokolski, counsel | 15,000.00 | — | 15,000.00 |
| Charles Bennett Maar, chairman | — | 5,575.00 | 5,575.00 |

Settle order on notice.